# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>MICHAEL THOMAS GATENA and<br>CARLA GRACE ENGLER,<br><br>　　　　Defendants. | Case No. CR05-1021<br><br>REPORT AND RECOMMENDATION |

　　　　This matter comes before the court pursuant to Defendants Carla Engler and Michael Gatena's August 23, 2005 motion to suppress (docket number 46). The court issued a Report and Recommendation concerning portions of the defendants' motion to suppress on September 7, 2005, in which the court denied the defendants' motion in part and reserved ruling as to three warrantless searches (docket number 65). The court held an evidentiary hearing concerning the three warrantless searches on September 15, 2005, at which Defendant Michael Gatena was present and represented by Frank Santiago, and Defendant Carla Engler was present and represented by Steve Swift. The government was represented by Assistant United States Attorney Dan Tvedt. For the reasons set forth in this Report and Recommendation, it is recommended that the portion of the defendants' motion to suppress for which the court had reserved ruling (docket number 46) be denied. The court considers each of the three challenged searches in turn.

1

## FINDINGS OF FACT

### December 30, 2004, Search and Seizure

On December 30, 2004, Deputy Schultz of the Dubuque County Sheriff's Office was on patrol in the vicinity of the 2900 block of White Street in Dubuque, Iowa. He observed a vehicle parked the wrong way on the street, unoccupied, with the passenger door standing open. Deputy Schultz looked into the vehicle to see if someone had been tampering with it. He noticed that the radio appeared to be missing and that one of the seats was pushed forward. Deputy Schultz knew upon viewing the license plate of the pickup that it belonged to Defendant Gatena. Deputy Schultz noticed seven garbage bags in the bed of the truck, the contents of which were visible through the bag. The garbage bags contained among other things, several dozen diamond brand matchbooks with the striker plates removed, several bottles of "Heet," and a discolored paper plate. Deputy Schultz used a flashlight to illuminate the vehicle and the garbage bags while he observed them.[1] There was also a street lamp close by. Based on the items Deputy Schultz observed in the open bed of Defendant Gatena's pickup, his knowledge and training that those items were commonly used in the manufacture of methamphetamine, and his knowledge concerning Defendant Gatena's involvement with methamphetamine manufacturing,[2] Deputy Schultz called for back-up assistance and obtained a search warrant to search the vehicle. Prior to the issuance of the search warrant, Deputy Schultz did not manipulate or remove any items found inside Defendant Gatena's pickup, as observed through the open door, nor did he manipulate or remove any of the items found in the bed of the truck.

---

[1] United States v. Pugh, 566 F.2d 626, 627 n.2 (8th Cir. 1977) (stating that fact that officers used flashlight does not affect application of the plain view doctrine).

[2] Deputy Schultz testified that this knowledge came by way of intelligence reports as well as from a search conducted at the Gatena and Engler residence approximately one month prior, which uncovered a complete red phosphorous lab.

## January 30, 2005, Search and Seizure

On January 30, 2005, Dubuque Police received a phone call from a Walgreen's Pharmacy employee who stated that Ms. Engler had purchased an unusually large amount of matches, the striker plates on which contain red phosphorous, a known methamphetamine precursor.[3] The Walgreen's employee relayed a description of the vehicle Ms. Engler was driving to the police. The Dubuque Police were familiar with Ms. Engler. They had previously received intelligence reports from the local drug task force of Ms. Engler's suspected involvement in the manufacture of methamphetamine and knew that Ms. Engler's driving privileges were suspended or revoked at the time in question.

After receiving the call from Walgreen's, Dubuque Police observed Ms. Engler's vehicle in transit. The police followed Ms. Engler's vehicle until she stopped at a local convenience store, where she was confronted by Dubuque Police. Ms. Engler was arrested for driving without a valid license.[4]

Either while Ms. Engler was being detained at the scene of her arrest, or shortly after her departure with Officer Michael Kane of the Dubuque Police Department, a drug detection dog, Iwan, indicated the possible presence of contraband during an external sniff of the vehicle Ms. Engler had been driving. The vehicle was subsequently searched and over twenty boxes of matches were found. Iwan also indicated on Ms. Engler's purse, which was inside the vehicle at the time of her arrest, but which the officers presented to Iwan for an external sniff. After Iwan alerted on Ms. Engler's purse, a search of the purse

---

[3] United States v. Crossland, 301 F.3d 907, 912 (8th Cir. 2002) (stating that from the perspective of experienced agents, red phosphorous is commonly known to be used in the manufacture of methamphetamine). The red phosphorous method of methamphetamine manufacturing is popular in Dubuque, Iowa.

[4] Ms. Engler pleaded guilty to this charge.

resulted in the seizure of drug paraphernalia and $532 in United States Currency. Ms. Engler seeks the suppression of this evidence.

## June 5, 2005, Search

On June 5, 2005, Dubuque Police Officer Ed Baker was on routine patrol. He was at the intersection of 29th and White Streets and observed a minivan parked on White Street, facing the wrong direction. The passenger side doors of the minivan were open.

Officer Baker ran the minivan's license plate and determined that it was registered to Heather Avenarius. Officer Baker learned that the police were trying to find Heather Avenarius to serve civil commitment papers on her. Baker drove around the block in an attempt to locate Ms. Avenarius. Officer Baker also knew that Heather Avenarius and defendant Carla Engler were involved in methamphetamine manufacturing activities. Finally, he knew that there was a warrant outstanding for Carla Engler's arrest.

In the course of his investigation of Heather Avenarius's minivan, he looked inside the open car to determine if there were car keys and to try to determine why it was parked in its unusual position.

Baker directed the dispatcher to try to call Heather Avenarius. He then asked the dispatcher to call Carla Engler's residence, which was in close proximity to the minivan at issue. There was no response to the dispatcher's phone calls or to Baker's later knock at the Carla Engler residence door.

Baker called for back-up. Because he knew of prior warrants executed at the Carla Engler residence, he summoned Officer Randy Roy and Roy's drug-sniffing dog Iwan to come to the scene to check for the presence of drugs. The dog eventually got in the minivan and alerted. Because of his concern for the potential for off-gassing of dangerous chemicals, Officer Baker determined that it was best to back away from the car and secure a search warrant.

The record reveals only one connection between defendant Carla Engler and Heather Avenarius's minivan. A neighbor told one of the police officers that he had

4

observed Carla Engler going to and from the vehicle some time earlier that day. There is no evidence that Carla Engler was a passenger in the vehicle that day, that she had driven the car that day, or that she had any other ownership or possessory interest in the minivan whatsoever.

## CONCLUSIONS OF LAW

### December 30, 2004, Search and Seizure[5]

Defendant Gatena challenges the initial search of his vehicle as well as the subsequently issued search warrant. The defendant argues that the items that Deputy Schultz viewed within the bed of his pickup, including matchbooks with the striker plates removed, bottles of "Heet," and a discolored paper plate, are all items which in and of themselves are completely innocent and are items commonly thrown away in people's trash.[6]

---

[5] The court considers the arguments concerning the December 30, 2004 search and seizure of Defendant Gatena's pickup in regard to Defendant Gatena only. Defendant Engler has not established any standing in regard to this search. Deputy Schultz testified that the pickup was unoccupied when he came upon it, and that he could not remember having ever seen Defendant Engler operate the vehicle. There was no testimony to indicate that Defendant Engler had any expectation of privacy in the pickup during the relevant time period.

[6] The court rejects Mr. Gatena's argument in this regard. Otherwise innocent items may be considered incriminating by officers with knowledge and experience concerning drug manufacturing and precursors for drug manufacturing. See United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003) (In determining that the officers' suspicion that criminal activity was afoot was reasonable, the United States Court of Appeals for the Eighth Circuit noted that the suspect's purchase of pseudoephedrine and lithium batteries was incriminating because both products are known methamphetamine precursors); see also United States v. Dishman, 377 F.3d 809, 810-11 (8th Cir. 2004) (stating that in addition to other information, evidence that suspect purchased three cans of Coleman fuel, left the store in a truck registered to a person known to be involved in the sale and manufacture of methamphetamine, and was traveling to a residence owned by a person who had previously been charged with tampering with ammonia, another

(continued…)

The court finds that Deputy Schultz observed the items found in the bed of Defendant Gatena's pickup in plain view. "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" United States v. Gillon, 348 F.3d 755, 759 (8th Cir. 2003) (citing Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)). "To satisfy the 'immediately apparent' standard, it is not necessary that a law enforcement officer know with certainty that an item is contraband or evidence of a crime." United States v. Murphy, 261 F.3d 741, 744 (8th Cir. 2001) (citing United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990)). All that is required to satisfy the "immediately apparent" requirement is probable cause to associate the item or items at issue with criminal activity. Id. at 744 (citing Texas v. Brown, 460 U.S. 730, 741-42 (1983) (citing Payton v. New York, 445 U.S. 573, 587 (1980)).

Deputy Schultz was certainly in a place that he could lawfully be when he observed Defendant Gatena's pickup. In looking over Defendant Gatena's car for signs of break-in or tampering, Deputy Schultz noticed the garbage bags and their contents. The contents of the garbage bags, together with Deputy Schultz's knowledge and experience concerning methamphetamine manufacturing in general as well as Defendant Gatena's involvement with methamphetamine manufacturing, created probable cause to associate the property with criminal activity. See United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003) (quoting United States v. Arvizu, 534 U.S. 266, 272 (2002) ("While each individual action [or item] taken by [or in possession of] the defendants could be susceptible to innocent explanation, their behavior [or the items] must be considered as a whole and in the light of the officers' 'experience and specialized training.'")).

---

[6](…continued)
methamphetamine precursor, supported the magistrate's determination that a search of the individual's residence would uncover evidence of wrongdoing).

6

Defendant Gatena has also challenged the sufficiency of the subsequently issued warrant for the search of his pickup. Because the evidence sought to be suppressed was gathered pursuant to a search warrant, the court employs the standard set forth in Illinois v. Gates, 462 U.S. 213 (1983), to determine the existence of probable cause. It is well established that a warrant affidavit must show particular facts and circumstances in support of the existence of probable cause sufficient to allow the issuing judicial officer to make an independent evaluation of the application for a search warrant. The duty of the judicial officer issuing a search warrant is to make a "practical, commonsense decision" whether a reasonable person would have reason to suspect that evidence would be discovered, based on the totality of the circumstances. United States v. Peterson, 867 F.2d 1110, 1113 (8th Cir. 1989). Sufficient information must be presented to the issuing judge to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusion of others. Gates, 462 U.S. at 239. However, it is clear that only the probability, and not a prima facie showing, of criminal activity is required to establish probable cause. Id. at 235.

This court does not review the sufficiency of an affidavit de novo. An issuing judge's determination of probable cause should be paid great deference by reviewing courts. Id. at 236. The duty of the reviewing court is simply to ensure that the issuing judge had a substantial basis for concluding that probable cause existed. Id. at 238-39.

Even where probable cause is lacking, the court's inquiry does not end. Pursuant to United States v. Leon, 468 U.S. 897 (1984), in the absence of an allegation that the issuing judge abandoned a neutral and detached role, suppression is appropriate only if the affiant was dishonest or reckless in preparing the affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. In Leon, the United States Supreme Court noted the strong preference for search warrants and stated that in a doubtful or marginal case a search under a warrant may be sustainable where without one, it would fall. Id. at 914.

> Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, . . . for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search. . . . Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable,
> . . . and it is clear in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

Id. at 922-23.

Pursuant to Leon, suppression remains an appropriate remedy: (1) where the magistrate issuing a warrant was mislead by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, Franks v. Delaware, 438 U.S. 154 (1978); (2) where the issuing magistrate wholly abandons the judicial role and becomes a "rubber stamp" for the government; (3) where the officer relies on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid. In Leon, the remedy of suppression was not ordered despite the fact that the affidavit in that case did not establish probable cause to search the residence in question. Further, the information was fatally stale and failed to properly establish the informant's credibility. The standard announced in Leon is an objective standard.

The court finds that the search warrant for Defendant Gatena's pickup, which was issued based upon the items found by Deputy Schultz in the pickup during his initial surveillance, intelligence reports to the effect that Defendant Gatena was involved in the manufacture of methamphetamine, and evidence found during execution of a warrant at the Gatena and Engler residence approximately one month prior, was supported by probable cause to believe that evidence of methamphetamine manufacturing would be

8

found in the pickup. If, for some reason, the warrant was found to be lacking in probable cause, the evidence gathered would certainly be saved from suppression by the good faith exception found in Leon. Accordingly, it is recommended that Defendant Gatena's motion to suppress evidence obtained as a result of the December 30, 2004 searches be denied.

### January 30, 2005, Search and Seizure

Ms. Engler seeks the suppression of evidence seized during a search of the vehicle she was driving on January 30, 2005. Ms. Engler claims that the search of the vehicle violated her rights under the Fourth Amendment to the United States Constitution because she had a legitimate expectation of privacy in the vehicle. The government claims that Dubuque Police had authority to search the vehicle upon impoundment and probable cause to search the vehicle pursuant to a drug detection dog's indication of possible contraband in the vehicle. Ms. Engler's motion to suppress should be denied for the reasons set forth below.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The vehicle Ms. Engler was driving on January 30, 2005, was impounded by Dubuque Police following the request of the private parking lot's owner. It is well established that law enforcement officers may conduct a warrantless search and inventory of a vehicle in order to protect the owner's property, protect the police against claims of lost or stolen property, and protect the police from potential danger.[7] United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001) (citing Colorado v. Bertine, 479 U.S. 367, 372 (1987)). Such inventory searches, if conducted

---

[7] The United States Court of Appeals for the Eighth Circuit has held that "[t]he intrusion is justified by governmental interests in protecting the owner's property while it remains in police custody, in protecting the police against claims or disputes over lost or stolen property, and in protecting the police from potential danger." United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998) (citing South Dakota v. Opperman, 428 U.S. 364, 376 (1976)).

9

according to reasonable, standardized police procedures, "which vitiate concerns of an investigatory motive or excessive discretion," are reasonable. Id. at 776 (citing United States v. Marshall, 986 F.2d 1171, 1174 (8th Cir. 1993)). However, "law enforcement officers may not raise the inventory search banner in an after the fact attempt to justify what was . . . purely and simply a search for incriminating evidence." Id. When law enforcement officers conduct an inventory search in accordance with reasonable, standardized procedures, they do not have to shield their eyes from incriminating items that may be discovered in the course of the inventory search, "so long as their sole purpose is not to investigate a crime." Id. (citing Marshall, 986 F.2d at 1175). In determining whether a given inventory search is reasonable, the court considers the totality of the circumstances. Id. at 775 (citing Marshall, 986 F.2d at 1175). Upon "lawfully taking custody of an automobile, police may search the automobile without a warrant to produce an inventory of the automobile's contents." United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998) (citing South Dakota v. Opperman, 428 U.S. 364, 376 (1976)).

The circumstances surrounding the inventory search following the private property impound request, as testified about during the September 15, 2005 hearing, do not cause the court concern that the Dubuque Police Department's inventory policy was unreasonable, that the officers exercised impermissible or unfettered discretion in conducting an inventory search of the vehicle following the private property impound request, or that the inventory search itself was conducted in an unreasonable manner.

Moreover, Dubuque Police had probable cause to search the vehicle Ms. Engler was driving on January 30, 2005, and all of its contents, after the drug detection dog alerted police to the possible presence of contraband during an exterior sniff.[8] An exterior sniff by a drug detection dog "does not constitute a 'search' within the meaning of the Fourth

---

[8] The court finds that the drug detection dog involved in the January 30, 2005 and June 5, 2005 searches, Iwan, is a qualified detection dog based on the training and experience of the dog as testified to at the September 15, 2005 hearing.

Amendment." See United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999). "The exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" New York v. Class, 475 U.S. 106, 114 (1986), quoted in $404,905.00 in U.S. Currency, 182 F.3d at 647. Furthermore, police need not "have a reasonable suspicion that a vehicle was transporting contraband before subjecting it to a canine sniff." See $404,905.00 in U.S. Currency, 182 F.3d at 647. Once a drug detection dog indicates the possible presence of contraband during an exterior sniff, police have probable cause to conduct a search of the vehicle's interior without a warrant. Id. Because the dog sniff established probable cause to search, the vehicle could be searched without a warrant. United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994), cert. denied., 514 U.S. 1113 (1995).

### June 5, 2005, Search

It is clear that Defendant Carla Engler has no standing to object to the search of the minivan registered to Heather Avenarius. There is absolutely no evidence in this record of any ownership, possession, or control of the minivan on June 5, 2005. Of course, it is well settled that a passenger of a vehicle does not have standing to object to the warrantless search of that vehicle. Rakas v. Illinois, 439 U.S. 128 (1978). This defendant does not even have the status of a vehicle passenger. She cites no authority for the proposition that someone merely approaching and leaving a car can have standing to object to the search of that car when it is open and illegally parked on a public road.

Upon the foregoing,

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[9] to this report and recommendation within ten (10) days of the date of this

---

[9]Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting to this report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.

11

report and recommendation, that the defendants' August 23, 2005, motion to suppress (docket number 46) be denied.

September 22, 2005.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT